# Lundy v. Brown's Adm'x.

October 31, 1947.

J. S. Forester, Judge.

Davis, Boehl, Viser & Marcus, and James Sampson for appellant.
Astor Hogg and J. B. Carter for appellee.

OPINION OF THE COURT BY JUDGE REES—Affirming.

Harold J. Brown, a boy fourteen years of age, was struck and killed by an automobile driven by appellant, W. R. Lundy. The accident occurred about 7:40 a. m., February 19, 1946, on the highway leading from Pineville to Harlan in or near Coldiron, an unincorporated settlement in Harlan County. Serena Brown, mother of Harold J. Brown, qualified as administratrix of his estate, and brought this action to recover damages for his death. The jury returned a verdict for $5,000 in favor of the plaintiff, and the defendant has appealed. It is argued that the trial court erred in overruling defendant's motion for a directed verdict, in admitting evidence, and in giving instructions to the jury.

It is first insisted that the proximate cause of the accident was the act of the decedent in running out onto the road in front of appellant's automobile without warning, and that there is no evidence of negligence on the part of the appellant. There were only two eyewitnesses to the tragedy, Richard Blanton, a sixteen year old boy, and appellant. At the point of the accident the highway is paved with concrete 20 feet wide, and is practically level and straight for a distance of 1,200 feet toward Pineville. The shoulders are about 6 feet wide. Appellant was traveling toward Harlan from Pineville. The accident occurred between a filling station and a schoolhouse where the deceased attended school. Richard Blanton, who was walking along the side of the highway toward the schoolhouse, testified that he saw Harold Brown get out of an automobile at the filling station 125 or 150 feet away and start down the road toward the schoolhouse. The witness continued walking down the highway. The Brown boy approached him from behind, struck him on the back, and the witness immediately saw Brown's body hurtling through the air. He did not know that an automobile was approaching from the rear, but just as the Brown boy was struck he saw appellant's car pass and stop 91 feet down the road. He measured the distance from the point where the Brown boy was struck to the point where the body fell, and the distance was 50 feet. He testified that the automobile was traveling at a speed of 45 or 50 miles an hour, and that he did not hear any horn sounded before Brown was hit. Appellant testified that he left his home in

Pineville about 7 a.m. and reached Coldiron about 7:40 a.m. He passed an automobile 400 or 500 yards from the accident, and then saw the Brown boy and Blanton ahead of him walking toward Harlan. As to what occurred thereafter, he testified as follows:

"Q. When did you first notice the Blanton boy that testified and the Brown boy? A. I noticed those boys going beyond the filling station toward the little village of Coldiron.

"Q. What were they doing? A. Kindly rooster fighting like we used to do at school.

"Q. What? A. Nudging each other with elbows.

"Q. Where with reference to the highway? A. At that time they were on the highway.

"Q. What did you first do when you first saw them? A. I checked my speed and blew the horn.

"Q. How many times? A. Three times, I blew the horn.

"Q. What did Richard Blanton and the boy who was killed, you later learned was Harold J. Brown, what did they do? A. They moved over on the dirt.

"Q. When you first saw them, what direction were they going? A. Toward Harlan in the direction I was.

"Q. When they moved off the highway, after you blew the horn which direction were they going? A. They were still going in the direction I was.

"Q. Where were they with reference to the traveled part of the road? A. They were off the concrete. * * *

"Q. Where were you with reference to the center line on the road which is shown on the map filed by Mr. Fish? A. I was in the center of my lane.

"Q. After you blew the horn and checked your speed, how fast were you going? A. I was making between thirty and thirty-five.

"Q. After these boys got off the road and you approached them, how were they walking along on the dirt shoulder? A. For a few seconds, they were quiet,

and no activity; as I approached them, Harold was on the inside next to me; he hit the boy on the outside, and the boy drew back to hit him, and he started to run across the road.

"Q. How far were you? A. Five, six or seven feet.

"Q. What warning or notice did you have that the boy was going to run on to the road, before he actually did run on the road? A. I had no warning whatsoever.

"Q. Previous to that, how had these boys been walking along? A. Nudging one another with elbows. After they quit that, they were going along for a few seconds, and no action taking place.

"Q. Were they walking or standing still? A. Walking.

"Q. How? A. Walking with their back to me going up the road.

"Q. When you say you got within five, six or seven feet of them and the Brown boy hit the other boy and the other boy hit at him, and the Brown boy run in the road, what did you do? A. I threw the car to the left to get away; I had got my wheels across the black line at center of the road catty cornered, and I heard glass fall out of my head light. I didn't see it hit him; I liked to have lost control getting away; when I pulled over and stopped, I went back to see what was the matter.

"Q. What did you find? A. I found this boy lying on the side of the road, with his head toward the highway and his feet toward the fence.

"Q. How far was he off the road? A. He was off the road, I guess, five or six feet from the concrete.

"Q. Where was his body lying with reference to the place he ran into your car, or your car struck him? A. His body was sixteen or seventeen feet diagonal over from my car in the edge of the highway."

Three or four witnesses testified that they saw appellant at Harold Brown's funeral, and heard him say that he was traveling at a speed of 40 miles an hour at

the time of the accident. The Brown boy was struck in front of the residence of Henry Beaute who heard the impact and ran out on the highway. He saw glass from the broken headlight on the highway about 2 feet from the edge of the concrete and off the concrete on the right side of the road. Richard Blanton pointed out the place where Harold Brown had been struck, and Beaute made some measurements which showed that the accident occurred 150 to 200 feet beyond the filling station toward Harlan; that the Brown boy was knocked a distance of 48 feet; and that appellant's automobile stopped between 80 and 100 feet from the point of impact. It appears that the filling station referred to in the evidence is at the west end of the village of Coldiron and the schoolhouse is at or near the east end. Along the road at this point are 50 or 75 residences. West of the filling station is a road sign marked "School Zone" facing travelers going in the direction of Harlan. In view of the foregoing facts, the case was clearly one for the jury. Appellant testified that he sounded his horn when he saw the deceased and Blanton playing on the paved part of the road in front of him and that they stepped off the concrete onto the shoulder of the road and ceased playing for a short interval, but he was contradicted by Blanton who testified that he heard no horn, did not know the car was approaching, was not "rooster fighting" with the deceased on the paved portion of the road, and first learned of deceased's presence when the latter hit him on the back and was immediately struck by appellant's automobile. There was evidence from which the jury might reasonably infer that appellant failed to sound his horn or to have his car under reasonable control considering the circumstances. Trainor's Adm'r v. Keller, 257 Ky. 840, 79 S. W. 2d 232; Collett's Guardian v. Standard Oil Co., 186 Ky. 142, 216 S. W. 356.

Appellant complains because Richard Blanton was permitted to express an opinion as to the speed of the automobile. Several cases are cited, but in each of them the evidence was held to be inadmissible because the witness did not have sufficient opportunity to observe the speed. Here, the automobile passed within a few feet of the witness who saw it travel down the road nearly 100 feet before it stopped, and observed the force

of the impact. His situation was such as to afford him an opportunity to observe its speed.

Instruction No. 1, which defined appellant's duties as the driver of the car, is criticized because it told the jury that it was appellant's duty "at such place or places, as he had reasonable grounds to anticipate that persons would be on the highway in front of said car, or so near thereto to be in danger of the approach of a car to such place, to sound the horn." It is argued that KRS 189.080 requires the operator of a motor vehicle to sound his horn only when necessary as a warning of the approach of such vehicle to pedestrians, and that the quoted part of the instruction does not leave to the jury the question of necessity of sounding the horn. Appellee insists that the instruction conforms substantially to the statutory provision as construed by this court in Fork Ridge Bus Line v. Matthews, 248 Ky. 419, 58 S. W. 2d 615, and other cases, but, be that as it may, appellant was not prejudiced since his own testimony disclosed a state of facts requiring the sounding of his horn, and the only question for the jury to determine was whether or not the horn was sounded.

Appellant's principal criticism of the instructions is directed to the instruction defining the term "ordinary care" as applied to him which reads:

"In these instructions the phrase 'ordinary care' as applied to a driver of an automobile means that degree of care usually exercised by an ordinary and careful, prudent person to avoid injury to a child the size and apparent age of Harold J. Brown under circumstances similar to, or like those in this case."

He objects to the inclusion in the instruction of the words "to a child the size and apparent age of Harold Brown" on the ground that this placed the deceased in the same category as an infant of tender years, whereas having passed the age of fourteen years he should have been placed in the same category as an adult. The age of the deceased was fourteen years and three months. A child of fourteen years of age is not a child of tender years, a term usually applied to children under fourteen years of age, but neither is he an adult. It is a matter of common knowledge that the stage at which physical and mental maturity is reached varies

with the individual and is dependent on many factors. It cannot be determined with mathematical accuracy, but it is universally recognized that it is not reached at the age of fourteen. Until a minor has reached the state of maturity showing him to be capable of using the judgment of a reasonably prudent adult, his conduct is not to be measured by the same standard as that of a mature person, but by such judgment and experience as children of similar age, experience and judgment would use under the circumstances. As said in 38 Am. Jur., Negligence, section 205:

"The fact that a child has passed the age of fourteen does not warrant the belief that it is no longer apt to be daring, thoughtless, and reckless. Moreover the standard by which the conduct of a child is judged, that is, the conduct of a child of the same age, capacity, experience, discretion, and knowledge, should not be displaced by the standard of adult conduct from the fact alone that the child whose conduct is in question is over fourteen years old."

In Louisville & N. R. Co. v. Hutton, 220 Ky. 277, 295 S. W. 175, 53 A. L. R. 1328, it was held that a child over fourteen years of age was not entitled to the benefit of the attractive nuisance doctrine, but it was pointed out that since the doctrine was an innovation upon the rule disallowing a cause of action to an admitted trespasser upon the premises of another the tendency of courts has been to narrow instead of to enlarge it. It was held that the doctrine applied only to children of tender years. Such a fixed line of cleavage has never been applied in ordinary negligence cases as to the standard of conduct required either of the child or toward him. The duty of the driver of an automobile is greater in the case of a child than in the case of an adult under similar circumstances, 38 Am. Jur., Negligence, sections 37 and 40, and we see no reason why an instruction should not define that duty. In City of Louisville v. Lee, 157 Ky. 285, 162 S. W. 1141, a sixteen year old boy received an injury due to a defective place in the street, and recovered a judgment from the city. One of the errors assigned was that the court should not have instructed the jury that ordinary care as applied to the injured boy meant that degree of care that might be usually expected of boys of his age, capacity and ex-

perience under the same or similar circumstances. In holding that the instruction was not improper, the court said:

"An instruction in this form, in suits to recover for injuries to minors, has been repeatedly approved, and we see no reason why the court should not have given it in this case, although perhaps the failure to so instruct would not have been substantial error to the prejudice of appellee, if he were the complaining party on this appeal."

In the present case the proof showed that the deceased, Harold Brown, was in the eighth grade in school, and was a normal, average child. We conclude that the instruction defining ordinary care as applied to appellant was not improper.

Appellant offered several instructions relative to the duties of the deceased which the court refused to give, but the theory of these instructions was embodied in the instruction on contributory negligence offered by appellant and given by the court. This instruction was probably more favorable to appellant than the one to which he was entitled. We find no prejudicial error in the instructions.

The judgment is affirmed.